# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| ERICK L. PADILLA, | ) | CASE NO. 5:24-CV-484-BMB |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |
| | ) | |

## I.      INTRODUCTION

The Commissioner of Social Security denied Plaintiff Erick L. Padilla's application for Supplemental Security Income (SSI) and Disability Insurance Benefits/Child Disability Benefits (DIB). Mr. Padilla seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule 72.2(b). (*See* ECF non-document entry dated March 15, 2024).

For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II.     PROCEDURAL HISTORY

In 2022, Mr. Padilla applied to the Social Security Administration (SSA) seeking period of disability, DIB, and SSI benefits; he claimed that he became disabled on June 15, 2011. (Tr. 175, 190–95.)[1] He identified three allegedly disabling conditions: (1) "aut[is]m spectrum"; (2) anxiety;

---

[1] The administrative transcript appears at ECF No. 6. I will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 16"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 7") and page-identification numbers (e.g., "PageID# 753").

and (3) depression. (Tr. 199.)

The Social Security Administration ("SSA") denied Mr. Padilla's application initially and upon reconsideration. (Tr. 73, 82, 92–95, 106–07.) Mr. Padilla requested a hearing before an administrative law judge ("ALJ"). (Tr. 108.) He submitted a brief in support of his position in advance of the hearing. (Tr. 243–45.) The ALJ held a hearing on May 11, 2023, at which Mr. Padilla was represented by counsel. (Tr. 35–72.) Mr. Padilla testified, as did his mother and an independent vocational expert ("VE"). (*Id.*)

On May 24, 2023, the ALJ issued a written decision finding that Mr. Padilla is not disabled. (Tr. 30).

Mr. Padilla requested review of the ALJ's decision. (Tr. 172–73.) His counsel submitted a letter objecting to the ALJ's conclusions. (Tr. 268–71.) On February 2, 2024, the SSA Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1.)

On March 15, 2024, Mr. Padilla filed his Complaint, challenging the Commissioner's final decision that Mr. Padilla is not disabled. (ECF No. 1.) Mr. Padilla asserts the following assignment of error:

> The ALJ failed to follow SSR 16-3p and SSR 96-8p in discrediting Plaintiff without proper support and did not articulate why he rejected the limitations claimed by Plaintiff.

(ECF No. 7, PageID# 753.)

## III.     BACKGROUND[2]

### A.     <u>Personal, Educational, and Vocational Experience</u>

Mr. Padilla was born in December 2003 and was 18 years old on the date of his application.

---

[2] Mr. Padilla's assignment of error focuses on his alleged limitations stemming from mental health conditions. Therefore, I limit my discussion of the factual background to those facts relevant to Mr. Padilla's mental health conditions and related limitations.

(*E.g.*, Tr. 74). He completed the ninth grade but did not graduate high school; he participated in an individualized education program for autism. (Tr. 45, 200.) He hopes to go back to school or earn a GED. (Tr. 45–46.) He lives with his mother, stepfather, and siblings. (Tr. 45.) He has never worked. (Tr. 46.)

**B.** **Function Report**

Mr. and Ms. Padilla completed a function report (SSA Form 3373) in March 2022. (Tr. 206–13.)

They wrote that all Mr. Padilla does, from the moment he wakes up until he goes to sleep, is "play games in [his] room." (Tr. 207.) He has a few friends that he interacts with over video games. (Tr. 210.)

They wrote that Mr. Padilla had no problems feeding himself or using the restroom but only changed his clothes once a week and was working with a counselor on "sensory issues" related to bathing. (Tr. 207.) Mr. Padilla needs reminders to take a shower, which happens once a week. (Tr. 208.) They characterized the weekly shower as a "big step." (Tr. 213.) Mr. Padilla does not make his own meals, except that he can make simple meals—like sandwiches—and is learning to operate the oven to make pizza. (Tr. 208.) They wrote that Mr. Padilla was working to learn how to do chores and was working with a counselor related to sensory issues involved in completing chores. (*Id.*)

They wrote that Mr. Padilla goes outside daily to walk the dog. (Tr. 209.) He is unable to travel alone because of sensory issues and anxiety. (*Id.*) He has not participated in family events or sports for the past five or six years. (Tr. 210.)

They wrote that Mr. Padilla follows simple oral instructions well when completing small tasks. (Tr. 211.) But he has trouble concentrating and remembering things and can only pay

attention for 15 to 20 minutes at a time "during reading." (*Id.*) He gets "overwhelmed and frustrated" with authority figures. (*Id.*) He does not handle stress well and has a difficult time with change. (Tr. 212.)

    **C.**    **Relevant Hearing Testimony**

        *1.*    ***Mr. Padilla's Testimony***

Mr. Padilla does not drive. (Tr. 46.) He does not go for walks, go to the grocery store, or go other places outside the home with any regularity. (*See* Tr. 51.)

Mr. Padilla was hospitalized overnight for behavioral health concerns when he was 12 years old; he does not remember why. (Tr. 49.)

Mr. Padilla testified that he has severe anxiety, to the point that he has trouble leaving the house. (Tr. 47.) He has a panic attack from time to time, although he could not estimate how frequently they have occurred. (Tr. 48.) The panic attacks tend to last at least ten minutes. (*Id.*) Mr. Padilla finds himself crying every "once in a while." (Tr. 50.) He experiences mood swings and irritability. (*Id.*) He has trouble with short-term memory and concentration "all the time." (*Id.*)

Mr. Padilla has tried various medications for the condition, and he has found that his current serotonin and norepinephrine reuptake inhibitor is working better than any of the previous treatments. (Tr. 47–48.) He also sees a counselor every other week, virtually over a computer. (Tr. 49.)

Mr. Padilla plays video games and will interact with friends virtually through the games. (Tr. 50–51.) He watches videos online and streams television, although he finds himself "not paying attention or something" during longer episodes. (Tr. 51–52.)

Mr. Padilla will take one of their dogs for a walk in the backyard from time to time and occasionally gives the dog food or water. (Tr. 52.)

Mr. Padilla hardly ever showers or brushes his teeth. (Tr. 52–53.) He estimated that half of the days, he does not leave his room except to use the restroom and barely interacts with his family. (*See* Tr. 53.)

In a typical day, Mr. Padilla will wake up sometime overnight, try to go back to sleep, and then play video games and watch videos for the rest of the day until he feels tired again. (Tr. 55.)

On examination by his counsel, Mr. Padilla testified that he had not left the house for several months. (Tr. 56.) When he had to leave the house last, to get his blood drawn, he felt "kind of crappy and annoyed" that he had to have his blood drawn again. (*Id.*)

### 2.   *Amanda Padilla's Testimony*

Amanda Padilla—Mr. Padilla's mother—testified that Mr. Padilla gets "sensory issues and anxiety when he has to get into the shower or do, really, anything at all." (Tr. 59.) She said Mr. Padilla does not even leave his room for holidays like Christmas and Easter. (*Id.*) He has one friend that he interacts with over videogames, but he otherwise does not interact with anyone except her and sometimes her fiancé. (*Id.*)

She has noticed a "little bit of improvement" since Mr. Padilla started taking medicine and attending counseling every other week, but recently there has been a slide backwards. (*Id.*)

Ms. Padilla described that Mr. Padilla has anxiety when he has to leave the house, to the point that he gets sick and experiences "trauma"; when Mr. Padilla left the house to get his blood drawn, he ended up passing out and was transported to a hospital with a low heart rate. (Tr. 60.)

When Mr. Padilla takes a shower, he needs her to blow his hair dry immediately "because the sensation of -- it just scares him, the whole water thing." (Tr. 61.)

Ms. Padilla took Mr. Padilla out of school after the eighth grade because he kept falling asleep and getting suspended. (Tr. 62.) Mr. Padilla developed issues with taking showers after that

point. (*Id.*) The condition got progressively worse until around two years before the hearing. (*Id.*)
Mr. Padilla then improved for two years before taking a recent turn back. (*See id.*)

### 3.    *Vocational Expert's Testimony*

In his first hypothetical question, the ALJ asked the VE to consider a hypothetical
individual with Mr. Padilla's age, education, and experience who could perform the full range of
medium work but who was more limited as follows: the individual could never climb ladders,
ropes, or scaffolds; the individual could frequently climb ramps and stairs; the individual could
frequently stoop, kneel, crouch, and crawl; the individual would never be exposed to hazards like
"unprotected heights, dangerous moving mechanical parts, and commercial driving"; the
individual would be limited to performing simple routine or repetitive tasks and would not be able
to perform tasks that require a high-production-rate pace; the individual could make only simple,
work-related decisions and would not be responsible for the safety or welfare of others; the
individual could interact on an occasional basis with supervisors and coworkers in a nonpublic
work setting; the individual would be limited to superficial contact (i.e., no group, tandem, or
collaborative tasks, and no management, direction, or persuasion of others); the individual could
respond appropriately to occasional changes in a routine and relatively static work setting, as long
as those changes were easily explained and/or demonstrated in advance of gradual implementation.
(Tr. 64–65.) The ALJ asked the VE whether there were unskilled jobs available for such a person.
(Tr. 65.)

The VE testified that such an individual could do the work of a "hand packager"
(DOT 920.587-018), a "cleaner II" (DOT 919.687-014), or a "laundry worker I" (DOT 361.684-
014). (Tr. 65.)

The ALJ next asked the VE to imagine that the hypothetical individual had an additional

limitation, in that they could have occasional interaction with supervisors in a nonpublic work setting but could have no interaction or contact with coworkers. (Tr. 66.)

The VE testified that such a limitation—having no contact or interaction with coworkers—was work-preclusive. (*Id.*)

The ALJ next asked the VE to consider the individual from the first hypothetical, with an additional limitation that the individual must be able to work from home. (*Id.*) The VE testified that the specific three jobs she identified could not be done from home. (*Id.* at 66–67.) She further testified that an individual at the medium exertional level would "have a very difficult time locating employment that would be able to be done at home." (Tr. 67.) Therefore, she opined that such a limitation would be work-preclusive for the hypothetical individual. (*Id.*)

Finally, the ALJ asked the VE to imagine that the person from the first hypothetical question would occasionally need redirection or extra supervision to stay on task. (*Id.*) The VE testified that such a limitation would be work-preclusive because those would be accommodations. (*Id.*)

The VE testified that being off-task more than nine percent of the time is work-preclusive if chronic (three consecutive months or more); similarly, being absent two times per month is work-preclusive if chronic. (Tr. 67–68.)

On examination by Mr. Padilla's counsel, the VE testified that she would not consider poor hygiene to be work-preclusive. (68–70.)[3]

---

[3] After the hearing, Mr. Padilla's counsel objected to this testimony as contrary to Ohio law and Agency regulations, calling it "simply unbelievable." (Tr. 249–50.) Mr. Padilla has not asserted this testimony as error in this appeal.

### 1.  <u>State Agency Consultants</u>

#### a.  *Initial Level*

A disability examiner (Heather Thomas) and a psychologist (Jennifer Swain) reviewed Mr. Padilla's claim at the initial administrative level. (Tr. 73.) Dr. Swain opined that Mr. Padilla had a numberof moderate limitations with respect to understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (Tr. 78–79.) Nevertheless, she found that Mr. Padilla's ongoing treatment notes "are demonstrating improvement." (Tr. 80.) She opined that Mr. Padilla had the ability to remember and perform simple and routine tasks and could interact with others "for brief, superficial exchanges." (*Id.*) She further concluded that Mr. Padilla could work in a "relatively static setting where there are infrequent changes" and where any changes "are introduced in advance and gradually implemented." (*Id.*)

The consultants concluded that Mr. Padilla was limited to unskilled work but had no physical limitations. (Tr. 80–81.) Based on these findings, the consultants found that Mr. Padilla was not disabled. (Tr. 81.)

In a letter to Mr. Padilla explaining the decision, the Agency wrote that he was "still able to understand, follow and perform at least simple and routine tasks," "interact appropriately with others," and "cope with the stress of simple work tasks." (Tr. 95.)

#### b.  *Reconsideration Level*

In appealing the initial disability denial, Mr. and Ms. Padilla provided additional information through their attorney. (Tr. 214.) Specifically, they reported that Mr. Padilla's condition had worsened in April 2022, describing as follows:

> Claimant has severe depression and anxiety. He has features of OCD. He stays in bed more often than before. He neglects personal care/hyg[ie]ne at times. Claimant isolates and stays in room more. Claimant does not want to leave the house. He becomes extremely nervous to the point where he has

to take medication when he has to go to the doctor.

(Tr. 215.)

They further reported that Mr. Padilla had undergone "GED testing" to begin in June 2022.

(Tr. 217–18.) Ms. Padilla provided the following additional explanation:

> Claimant has lived in his room for the last 5-6 years. His sensory and social issues have worsened even though we have tried intervention. He has been taking small steps with a counselor learning how to use the microwave. He can now shower once a week with assistance in drying his hair. The noise of the shower can be too much for Erick so he showers on Wednesday nights only. He has a very hard time leaving the house, and being in a car. He takes Dramamine to be in a car longer than 10 minutes. He changes his clothes only when showering once a week. He is struggling with intrus[iv]e thinking, anxiety, depression, and severe sensory issues. He does not always respond in ways that is typical for an 18 year old.

(Tr. 218.)

On August 3, 2022, Ms. Padilla informed the Agency that Mr. Padilla had indeed started taking GED classes. (Tr. 230.) She further wrote that Mr. Padilla had continued on his prescribed medication, despite the worsening symptoms; she wrote that he "does not wish to take any other medications yet." (*Id.*)

At the reconsideration level, a disability examiner (Katharine Brodzeller), a physician (Mehr Siddiqi, M.D.) and a psychologist (Irma Johnston, Psy.D.) affirmed the finding that Mr. Padilla is not disabled. (Tr. 82, 91.) They added certain postural limitations related to Mr. Padilla's leg pain, but otherwise concluded that the findings at the initial level were "reasonable and well supported." (Tr. 86–88, 89.) They agreed that Mr. Padilla was limited to unskilled work, opined that he was limited to the medium exertional level, and concluded that he had the residual functional capacity to perform the work of a "router" (DOT 222.587-038), "order caller" (DOT 209.667-014), or "call-out operator" (DOT 237.367-014).

In a letter to Mr. Padilla explaining the decision, the Agency wrote that he was "able to

think, communicate and care for [his] own needs" despite his mental health limitations. (Tr. 107.)

    **D.**    <u>**Relevant Medical Evidence**</u>

Mr. Padilla underwent a psychological evaluation with Dr. Hal Wildman, Ph.D., on November 8, 2018, and December 14, 2018, for the purpose of evaluating whether Mr. Padilla had autism spectrum disorder. (Tr. 545–51.) Dr. Wildman noted that Mr. Padilla had been diagnosed with depression and anxiety disorder when he was eight years old "when he began to refuse to bathe." (*Id.*) He further noted that the referring psychiatrist had noted a diagnosis of autistic disorder. (*Id.*)

Dr. Wildman recorded that Ms. Padilla reported that Mr. Padilla "is easily distracted, sometimes doesn't respond when spoken to by others, is often withdrawn from family and others including peers, doesn't like to be touched, has sensitivity to water and refuses to bathe, as well as refusing to brush his teeth and change clothes." (*Id.*) She further reported that Mr. Padilla "pulls out his hair, overeats, and has trouble with sleeping and sleeps at school." (*Id.*) Dr. Wildman noted that Mr. Padilla "reportedly spends much of his time in his room playing video games and these games are, reportedly, essentially, the only times that he interacts with peers." (Tr. 546.) Mr. Padilla also reported being distracted, failing to do schoolwork, withdrawing from family and his peers, being sensitive to water, and failing to bathe or brush his teeth. (Tr. 550.) Dr. Wildman noted that individual counseling had reportedly not been successful in improving functioning in those areas. (*Id.*)

When Ms. Padilla completed the Autism Spectrum Rating Scale Parent, her responses were all in the "slightly elevated," "elevated," or "very elevated" range. (Tr. 548.) But in two diagnostic evaluations, Mr. Padilla displayed "minimal-to-no evidence of autism symptoms." (Tr. 548–49.)

Dr. Wildman concluded that the diagnosis of autism spectrum disorder was "very much in

doubt." (Tr. 550.) But he found the reported behavioral history to be consistent with a diagnosis of "[m]ajor depressive disorder, recurrent, severe" and a provisional diagnosis of generalized anxiety disorder. (*Id.*) Dr. Wildman suggested that Mr. Padilla undergo an assessment at Akron Children's Hospital for potential participation in an intensive outpatient psychiatric program to aid "in changing problem behaviors, improving interpersonal relationships, and coping with stressful situations." (*Id.*) He further recommended that Mr. Padilla consult with an occupational therapist specializing in the evaluation of sensory-processing difficulties, to address the reported sensitivities to water, to touch, and to wearing a prescribed continuous-positive-airway-pressure (CPAP) machine. (Tr. 551.)

Mr. Padilla consulted with Dr. Abigail Vallandingham, D.O., on June 10, 2020, with a complaint of numbness in his fingers. (Tr. 311.) Dr. Vallandingham noted a normal physical exam and discussed with Mr. Padilla that the numbness was likely due to his "remaining in the same position for video game playing all day." (*Id.*)

Mr. Padilla followed up with Dr. Michelle Burke, M.D., on June 17, 2020, because the numbness had "evolved into some discomfort in his hand, wrist, elbow and on occasion his shoulder." (Tr. 313.) Ms. Padilla told the doctor at the appointment that Mr. Padilla is "often anxious to leave the house." (*Id.*) Dr. Burke noted that Mr. Padilla reported a depressed mood but was not nervous or anxious at the appointment. (Tr. 314.)

Mr. Padilla was further evaluated by Dr. Steven Spalding, M.D., on June 19, 2020, regarding joint pain. (Tr. 319.) Dr. Spalding noted that Mr. Padilla appeared healthy and displayed normal mood, affect, and behavior, although Dr. Spalding did not ask questions about behavioral problems. (Tr. 323–25.)

Mr. Padilla consulted with Dr. Sharon McKee, M.D., on June 23, 2020, complaining of

significant unintentional weight loss. (Tr. 327.) Dr. McKee noted that "prolonged depression" was likely a factor. (*Id.*) Dr. McKee noted that Mr. Padilla presented with a "[f]lat affect." (Tr. 329.) Ms. Padilla reported at the appointment that Mr. Padilla had been in his room a lot since 2018, playing video games and seeming depressed and anxious. (Tr. 328.)

Mr. Padilla underwent an initial comprehensive assessment with Shaunaugh Turner, LISW, on May 8, 2020. (Tr. 395.) The assessment was conducted over the phone. (*Id.*) Mr. Padilla reported that having "real bad anxiety to where [his] arms and legs go numb and [he's] been having chest pain." (Tr. 396.) Ms. Padilla reported that Mr. Padilla had struggled with anxiety and depression for "some time" but had decided to stop medication and treatment in 2018 "because he felt nothing was working." (*Id.*) Mr. Padilla reported that he does not like talking to people. (Tr. 397.) Turner assessed that Mr. Padilla presented with depressed mood and flat affect, speaking slowly and hesitatingly. (Tr. 401.) Mr. Padilla's concentration was "fair," his thought processes were logical, and his thought content was normal. (*Id.*) He had "partial" judgment and impulse control and "fair" insight. (*Id.*) Turner concluded that, based on the reported symptomology, diagnoses of "major depressive disorder, severe" and generalized anxiety disorder were warranted. (Tr. 402.) Turner recommended individual and family therapy, which Mr. Padilla declined. (*Id.*) Turner referred Mr. Padilla to a psychiatrist for medication management. (*Id.*)

Mr. Padilla consulted with Elizabeth Pfalzgraf, APRN, in a telephone appointment on May 13, 2020. (Tr. 387, 390.) Mr. and Ms. Padilla reported behavioral symptomology consistent with previous reports (Tr. 390–91), but Ms. Pfalzgraf assessed that Mr. Padilla presented with normal speech, thought processes, associations, sleep, appetite, memory, insight, judgment, and concentration (Tr. 393.) Ms. Pfalzgraf identified Mr. Padilla as having a history of major depressive disorder and generalized anxiety disorder; she recommended genetic testing and

postponed prescribing medication pending those results. (Tr. 393.)

Mr. Padilla next consulted with Ms. Pfalzgraf in a telehealth appointment on May 28, 2020. (Tr. 383.) There had been no changes in Mr. Padilla's symptoms. (*Id.*) After reviewing the genetic-testing results, Ms. Pfalzgraf started Mr. Padilla on bupropion hydrochloride (Wellbutrin), a norepinephrine- and dopamine-reuptake inhibitor (NDRI). (Tr. 385.)

Mr. Padilla followed up with Ms. Pfalzgraf in a telehealth appointment on June 16, 2020. (Tr. 379.) Mr. Padilla reported no side effects from the medication change and Ms. Padilla reported improvement with hygiene, with Mr. Padilla showering once a week. (*Id.*) Mr. Padilla reported that his anxiety was better but said his depression felt the same and reported some trouble sleeping. (Tr. 379–80.) Mr. Padilla was continued on his medication without changes. (Tr. 382.)

Mr. Padilla next met with Ms. Pfalzgraf on July 16, 2020, again in a telehealth appointment. (Tr. 375.) Mr. Padilla reported that he has been "mentally tired lately," but several improvements were noted, including that Mr. Padilla had not been isolating himself as much. (*Id.*) Mr. Padilla reported that his anxiety and depression symptoms had improved, but Ms. Pfalzgraf noted that Mr. Padilla's responses were "short" and that he and his mother reported that he was tired and "has had quite a few things going on." (Tr. 375–76.) Ms. Pfalzgraf again assessed that Mr. Padilla's mental status factors were "fair," "good," or "normal," although his mood and affect were depressed (Tr. 377.) No changes were made to his medication. (Tr. 378.)

Mr. Padilla's next telehealth appointment with Ms. Pfalzgraf was on August 17, 2020. (Tr. 370.) Mr. Padilla rated his anxiety as a one, on a scale of one to ten (with ten being the worst). (Tr. 370–71.) But Ms. Padilla reported that Mr. Padilla "is depressed and overwhelmed" and "is also back to not showering." (Tr. 370.) Ms. Pfalzgraf again assessed Mr. Padilla's mood as depressed and his affect as flat, but she noted that other mental-status indicators were normal or

13

good. (Tr. 372.) Ms. Pfalzgraf assessed his anxiety as stable and his depression as worsened; she increased the dosage of his NDRI medication and planned to refer him to therapy. (Tr. 372–73.)

At a telehealth appointment with Ms. Pfalzgraf on September 28, 2020, Ms. Padilla noted that Mr. Padilla's appetite had improved with a new medication — desvenlafaxine succinate (Pristiq), a selective-serotonin-and-norepinephrine reuptake inhibitor (SNRI). (Tr. 366.) Mr. Padilla reported an improved mood and said his anxiety was "okay." (*Id.*) His mood and affect were again "depressed," with other mental-status indicators normal. (Tr. 368.) Ms. Pfalzgraf increased the dosage of his SNRI. (Tr. 368–69.)

At the next telehealth appointment, on October 26, 2020, Ms. Padilla reported to Ms. Pfalzgraf that Mr. Padilla had stopped taking his medication and had become irritable. (Tr. 362.) Mr. Padilla reported that he stopped taking the medication because he did not have anxiety anymore, but he said his anxiety returned when the medication stopped. (*Id.*) Mr. Padilla was educated on the importance of continuing to take his medication. (Tr. 365.)

Mr. Padilla reported taking his medicine more consistently at the next telehealth appointment with Ms. Pfalzgraf, on December 1, 2020. (Tr. 355.) Mr. Padilla said the medication was helping and reported that his anxiety and depression were "fine." (*Id.*) Ms. Padilla said that Mr. Padilla had had a panic attack on Thanksgiving but reported that his sleep schedule was better; she also reported that Mr. Padilla was attending online school every day but was not completing his schoolwork. (*Id.*) No changes were made to Mr. Padilla's medication. (Tr. 358.)

When Mr. Padilla had his next telehealth appointment on January 13, 2021, Ms. Padilla reported more improvement; he came out of his room on Christmas and his appetite and sleep had improved. (Tr. 272.) Ms. Padilla said he was only "occasionally" refusing to shower. (*Id.*) Ms. Pfalzgraf noted that Mr. Padilla's affect was depressed, but no changes were made to his

medication. (Tr. 274–75.)

Mr. Padilla met with Jennifer Cross, LPC, on March 11, 2021. (Tr. 502.) Ms. Padilla provided the medical history, "as [Mr. Padilla] does not like speaking on phones." (*Id.*) She reported that Mr. Padilla "stays in his room all the time" and exhibited "signs of autism" like sensory issues and "OCD type tendencies." (*Id.*) Ms. Cross found that the reported history met the criteria for autistic disorder and generalized anxiety disorder; she recommended counseling and medication management, but Mr. Padilla again declined counseling. (Tr. 510.)

At a telehealth appointment with Ms. Pfalzgraf on April 6, 2021, improvement was mixed. (*See* Tr. 410.) Mr. Padilla was taking his medication and was not isolating as much, and he reported increased motivation. (*Id.*) But he rated his anxiety as a five out of ten, and Ms. Padilla reported that he was "still not showering" and would log into school classes but not complete any of the assignments. (*See id.*) No changes were made to Mr. Padilla's medication, but counseling was again recommended. (Tr. 413.)

Mr. Padilla met virtually with counselor Richard Stein, LPCCS, on May 28, 2021. (Tr. 414.) Mr. Padilla presented with symptoms of anxiety and mood swings; his mood appeared to be anxious, and his affect was "constricted." (*Id.*)

Mr. Stein encouraged Mr. Padilla to increase his activities of daily living at the next counseling appointment on June 10, 2021, noting that Mr. Padilla presented with symptoms of anxiety and sadness, with "distorted thinking" and "poor personal hygiene." (Tr. 416.)

Mr. Stein noted "[s]low progress" at the next appointment on June 29, 2021; Mr. Padilla agreed to shower twice a week and brush his teeth once a day, but he again presented with anxiety, sadness, distorted thinking patterns, a neutral mood, and blunted affect. (Tr. 418.)

Mr. Padilla again presented with an anxious mood and blunted affect with Mr. Stein on

July 6, 2021 (Tr. 420.) He demonstrated a loss of motivation and a loss of interest in his personal appearance, but he identified that he was actively addressing his depression and personal-hygiene behaviors. (Tr. 420–21.)

Mr. Padilla met with a new counselor, John Roberts, in a telehealth appointment on July 21, 2021 (Tr. 422.) Mr. Padilla responded well to Mr. Roberts's education on coping skills, although Mr. Roberts noted "mild depression" and wrote that Mr. Padilla experienced "anxiety issues when out of the house." (*Id.*)

When Mr. Padilla met with Ms. Pfalzgraf in a telehealth appointment on July 27, 2021, he reported that his anxiety was reduced—"a large improvement for him." (Tr. 424.) Ms. Pfalzgraf nevertheless noted that Mr. Padilla's eye contact was "poor" and his hygiene appeared "questionable." (*Id.*) Mr. Padilla was continued on the same medication regimen. (Tr. 425.)

After a telehealth appointment on August 11, 2021, Mr. Roberts noted that Mr. Padilla had not been showering or brushing teeth as frequently as before, but he assessed that Mr. Padilla's progress was stable. (Tr. 427.)

By August 25, 2021, Mr. Roberts noted that Mr. Padilla was bathing regularly but was still struggling with some "disturbing images" that were affecting his sleep. (Tr. 429.)

Mr. Roberts assessed that Mr. Padilla was making "good progress" as of September 8, 2021, focusing on "reprocess[ing] targets relating to his anxiety." (Tr. 431–32.) By September 22, 2021, Mr. Padilla reported that his anxiety had decreased and that he was less anxious before bed. (*See* Tr. 433.)

At a telehealth appointment with Ms. Pfalzgraf on September 27, 2021, Ms. Padilla reported that counseling "seems to be helping quite a bit" and that Mr. Padilla was showering once a week. (Tr. 435.) Mr. Padilla, however, would only answer "yes or no questions" during the

appointment. (*Id.*) Ms. Padilla said that Mr. Padilla was "stable overall" with his medication. (*Id.*) No changes were made to Mr. Padilla's medication. (Tr. 437.)

Mr. Padilla met with a medical doctor, Jason Levine, DO, on October 5, 2021, related to some abdominal pain and other physical complaints. (Tr. 332.) Dr. Levine concluded that Mr. Padilla's anxiety and behavioral problems were contributing factors to these physical symptoms. (Tr. 333.)

Mr. Roberts noted that Mr. Padilla was "doing well" on October 6, 2021. (Tr. 438.) Mr. Padilla worked on reprocessing an anxious dream and said he was having less anxiety before bed. (*Id.*)

At his session on November 3, 2021, Mr. Padilla reported panic attacks to Mr. Roberts; while Mr. Roberts noted that Mr. Padilla was having trouble processing these situations, Mr. Roberts assessed that Mr. Padilla was "stable" and wrote that there were "[n]o issues to worry about at this time." (Tr. 440.)

Mr. Padilla reported that he was having fewer panic attacks as of December 1, 2021; in fact, he said had had none. (Tr. 442.) Mr. Roberts noted that Mr. Padilla wanted to avoid family members around the holidays but ultimately agreed to discuss the matter with Ms. Padilla. (Tr. 442.) Consistent with previous appointments, Mr. Roberts noted "slow progress" in Mr. Padilla's treatment. (Tr. 443.)

Mr. Padilla had a telehealth appointment with Ms. Pfalzgraf on December 9, 2021. (Tr. 404.) While his symptoms "seem[ed] to be improving," he was only showering once a week and "hygiene is still an issue." (*Id.*) Mr. Padilla had a hard time describing his depression but reported having a panic attack once a month. (Tr. 408.) Ms. Pfalzgraf continued him on the same medication regimen. (*Id.*)

Mr. Roberts noted on December 15, 2021, that Mr. Padilla was coping more effectively with anxiety "but continues to avoid others." (Tr. 444.)

At a follow-up appointment with Dr. Levine on December 21, 2021, the doctor noted that Mr. Padilla performs less than one hour of physical activity daily; Dr. Levine recommended that Mr. Padilla limit screen time. (Tr. 336.)

Mr. Padilla agreed to shower every day at a telehealth appointment with Mr. Roberts on January 5, 2022. (Tr. 446.) Mr. Padilla reported trouble sleeping at the appointment. (*Id.*)

Mr. Padilla met virtually with Kristen Miller, CNP–RN, on January 28, 2022. (Tr. 448.) Mr. and Ms. Padilla provided a report of symptomology consistent with previous appointments; Mr. Padilla reported anxiety and said he spends most of his time playing video games. (*Id.*) Ms. Miller recommended some medication changes, but Mr. Padilla declined any additional medication. (Tr. 448–49.) Ms. Miller did not note any abnormalities in Mr. Padilla's mental status. (Tr. 449–50.)

Mr. Roberts noted improved mood at a telehealth session on February 2, 2022, writing that Mr. Padilla was participating in a GED program and had thoughts about getting a job. (Tr. 451.)

On March 2, 2022, Mr. Roberts noted that Mr. Padilla was bathing and brushing his teeth frequently; he remained stable with some encouragement to leave the house for his GED classes. (Tr. 453.) Mr. Padilla was again noted as stable on March 16, 2022. (Tr. 455.) He complained that he did not like spending time with his mother or other family members, and he presented as cynical. (*Id.*)

He again espoused negative thoughts on March 30, 2022. (Tr. 457.) Mr. Roberts opined that Mr. Padilla often engages in "all or nothing" thinking on April 13, 2022. (Tr. 459.)

On April 27, 2022, Mr. Roberts noted that Mr. Padilla was going to try to bathe one more

day per week and would continue to work on sleep hygiene. (Tr. 461.)

Mr. Padilla consulted with Ms. Miller on April 28, 2022. (Tr. 463.) He spoke bluntly and avoided eye contact. (*Id.*) He noted increased anxiety and complained that he was not sleeping well but declined changes to his medication. (*Id.*)

Mr. Padilla consulted with Jennifer Demarco, CNP, on May 10, 2022, in a short call regarding potential exposure to Lyme disease; Ms. Demarco ordered blood work (Tr. 490.)

On May 25, 2022, Mr. Roberts noted that Mr. Padilla was stable but was having trouble implementing a reliable sleep routine that included bathing and brushing teeth. (Tr. 466.)

Mr. Padilla remained stable on June 8, 2022, reporting that he wanted to exercise and be outside every day but reporting that he continued to struggle with sleep. (Tr. 468.)

Mr. Padilla's sleep was improved by June 29, 2022. (Tr. 470.) Mr. Padilla reported to Mr. Roberts that he wanted to focus treatment on bathing more frequently. (*Id.*)

After a brief check-in with Ms. Demarco on July 6, 2021, Ms. Demarco noted symptoms consistent with severe depression and recommended that Mr. Padilla consult with a specialist in emotional instability. (Tr. 494–96.) Ms. Demarco noted that Mr. Padilla was not willing to leave the home for purposes of treatment. (Tr. 496.)

Mr. Roberts again noted "slow" but "good progress" at telehealth appointments on July 13 and 27, 2022. (Tr. 472, 694.)

Mr. Padilla consulted with Abdelrahman Abdelaziz, M.D., on August 10, 2022. (Tr. 696.) Mr. Padilla was "withdrawn" during this initial meeting but said his depression was "manageable." (*Id.*) Dr. Abdelaziz noted several abnormal findings in Mr. Padilla's mental status. (Tr. 697.)

Mr. Padilla consulted with Darin Carman, APRN–CNP on August 18, 2022. (Tr. 689.) He had a "slightly flat affect" during the appointment. (Tr. 690.)

Mr. Padilla met with Daniel Weiss, M.D., on August 29, 2022. (Tr. 711.) Dr. Weiss opined that Mr. Padilla's symptoms could be explained by "longstanding untreated Lyme disease." (Tr. 713.)

Mr. Padilla met with Dr. Abdelaziz on September 26, 2022. (Tr. 698.) Mr. Padilla presented as "withdrawn" and reported five-out-of-ten anxiety. (*Id.*) Dr. Abdelaziz wrote that "[s]ome of [Mr. Padilla's] social withdrawn behavior could be explained by autism." (*Id.*) The doctor assessed that Mr. Padilla was "well-groomed" but noted that his alertness was "diminished," his eye contact was "intermittent," his speech was at a "slow rate," and he was withdrawn. (Tr. 699.) No medication changes were made. (Tr. 698.)

When Mr. Padilla met virtually with Mr. Roberts on September 28, 2022, Mr. Padilla reported that he had not been showering or brushing his teeth because he was having trouble maintaining a good sleep schedule. (Tr. 701.) Mr. Roberts reported that Mr. Padilla was "stable." (*Id.*)

Mr. Roberts questioned how adherent Mr. Padilla had been to sleep recommendations after an appointment on October 12, 2022. (Tr. 703.) Mr. Roberts assessed Mr. Padilla as stable, having made no progress or regress since the last appointment. (*Id.*)

Mr. Padilla had improved somewhat by November 9, 2022, in that Mr. Roberts noted that he had been socializing with one friend over the internet and committed to brushing his teeth every day. (*See* Tr. 705.) But Mr. Padilla reported a lack of motivation and apathy. (*Id.*)

Mr. Padilla had made "little progress" on his hygiene plan by November 23, 2022, with once weekly showering and encouragement needed to brush his teeth daily. (Tr. 707.)

Mr. Roberts again noted, after an appointment on January 4, 2023, that Mr. Padilla had failed to engage in his hygiene plan consistently. (Tr. 709.) Mr. Roberts assessed that Mr. Padilla

had made no progress, noting that Mr. Padilla declined to participate in any activities other than video games. (*Id.*)

Mr. Padilla saw Dr. Abdelaziz on February 15, 2023. (Tr. 715.) Dr. Abdelaziz noted that Mr. Padilla said he was "feeling fine" but his mother asked for an increased dosage of Pristiq. (*Id.*) The doctor told her that he was on the maximum dosage allowed, and Mr. Padilla declined other additional medication. (*Id.*)

### E.    Other Relevant Evidence

Mr. Padilla's school records (Tr. 474–89, 524–34, 538, 540–44, 552–665) largely conform to the description of Mr. Padilla's education history as described by Mr. and Ms. Padilla to his treating doctors and counselors, described above. They reflect failing grades, excessive absences, mental health concerns, and class withdrawals from 2018 forward. They report that Mr. Padilla spends most of his time in his room, struggles to complete assignments completely, and "struggles with any situation that requires him to be in a large group of people." (Tr. 528, 612–13, 617–21, 623–26, 635–65.)

## IV.    THE ALJ'S DECISION

The ALJ first determined that Mr. Padilla is not eligible for DIB benefits because he never worked and therefore never met the insured-status requirements of the Social Security Act; further, he did not qualify for child disability benefits. (Tr. 18–19.)

The ALJ next determined that Mr. Padilla had not engaged in substantial gainful activity since March 3, 2022, the alleged disability-onset date. (Tr. 19.)

The ALJ next determined that Mr. Padilla had the following severe impairments: chronic arthralgias of the knees and hips with leg-length discrepancy; autistic disorder; unspecified anxiety disorder/generalized anxiety disorder; and major depressive disorder/unspecified depression. (*Id.*)

The ALJ also noted that Mr. Padilla had a history of the following non-severe impairments: Lyme disease and suspected exposure to mold; obesity; obstructive sleep apnea; headache; constipation, gastroesophageal reflux disease, and nausea; hypermobile joints; ulnar neuritis; pain in the left wrist and left hand, and numbness of the fingers; left elbow pain; chronic left shoulder pain; chronic midline low back pain; and asthma. (*Id.*) While the ALJ found these conditions to be non-severe, the ALJ noted that he considered all of these conditions when determining Mr. Padilla's residual functional capacity. (*Id.*)

The ALJ determined that none of Mr. Padilla's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ further determined that Mr. Padilla had the residual functional capacity ("RFC") to:

> perform medium work . . . except: He can never climb ladders, ropes and scaffolds, frequently climb ramps and stairs, stoop, kneel, crouch and crawl. He should avoid all exposure to hazards such as unprotected heights, dangerous moving mechanical parts, and commercial driving. He can perform simple, routine and repetitive tasks, but cannot perform tasks which require a high production rate pace (for example, such as assembly line work), can make only simple work-related decisions, and should not be responsible for the safety or welfare of others. He can interact on an occasional basis with supervisors and coworkers in a non-public work setting, but should be limited to superficial contact meaning no group, tandem or collaborative tasks, and no management, direction or persuasion of others). The claimant can respond appropriately to occasional change in a routine and relatively static setting, but changes should be easily explained and/or demonstrated in advance of gradual implementation.

(Tr. 21–22.)

The ALJ next determined that Mr. Padilla was 18 years old on the date of the alleged onset of disability, had no past relevant work, and had a limited education. (Tr. 28.)

However, the ALJ determined that, considering Mr. Padilla's age, education, work

experience, and RFC, there were jobs that existed in significant numbers in the national economy that Mr. Padilla could perform, including work as a "hand packager" (DOT 920.587-018), "cleaner II" (DOT 919.687-014), or "laundry worker I" (DOT 361.684-014). (Tr. 28–29.) Accordingly, the ALJ determined that Mr. Padilla is not disabled. (Tr. 29.)

## V.     LAW & ANALYSIS

As an initial matter, I note that Mr. Padilla does not seem to challenge the ALJ's determination that he is not eligible for Title II benefits. (Tr. 18–19.) Therefore, I recommend that the ALJ's decision denying those benefits be affirmed. I continue to examine Mr. Padilla's arguments with respect to his application for SSI benefits.

### A.     <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

**B.** **Standard for Disability**

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

 "A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not

prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

### C. <u>Analysis</u>

Mr. Padilla contends that the ALJ violated SSR 16-3p and SSR 96-8p "because the ALJ does not include a legally defensible explanation as to how the evidence of record is inconsistent." Mr. Padilla points specifically to the ALJ's conclusion that Mr. Padilla's alleged social isolation and inability to leave the home was contradicted by records showing that Mr. Padilla had friends and had some contacts outside of his immediate family. (Pl. Merits Br. at 18, ECF No. 7, PageID# 755.) Mr. Padilla also points to the ALJ's conclusion that medical records did not reflect significant mental status abnormalities that would support more than a moderate degree of limitations in the paragraph B criteria. (*Id.* at 22, PageID# 759.) Mr. Padilla contends that the ALJ's finding that his medical records were mostly normal, and the ALJ's conclusion that Mr. Padilla could handle occasional contact with supervisors and coworkers in a non-public setting, were not adequately explained and were not supported by substantial evidence. (*Id.*)

When a claimant alleges symptoms of disabling severity, an ALJ must follow a two-step process for evaluating these symptoms. *See Moore v. Comm'r of Soc. Sec.*, 573 Fed. App'x 540, 542 (6th Cir. Aug. 5, 2014); *Massey v. Comm'r of Soc. Sec.*, 2011 WL 383254 at * 3 (6th Cir. Feb. 7, 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20

C.F.R. § 404.1529(c)(1). *See also* SSR 16-3p, 2016 WL 1119029 (March 16, 2016).[4]

In evaluating a claimant's symptoms at the second step of the analysis, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. Beyond medical evidence, there are seven factors that the ALJ should consider. These factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029 at * 7.

The ALJ is not required to discuss each of these factors or even all the evidence in the record but need only acknowledge the factors and discuss the evidence that supports his decision. *See Bryson v. Comm'r of Soc. Sec.*, 2021 WL 2735993 at * 14 (N.D. Ohio June 10, 2021), *adopted by*, 2021 WL 2720071 (N.D. Ohio July 1, 2021). However, "[i]n evaluating an individual's symptoms, it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the

---

[4] The Social Security Administration ("SSA") previously characterized the evaluation of a claimant's subjective symptom complaints as a "credibility" determination. *See* SSR 96-7p, 1996 SSR LEXIS 4 (July 2, 1996). In March 2016, however, the SSA issued SSR 16-3p. Therein, the SSA explained that this characterization did not accurately reflect the language in the regulations and eliminated the term "credibility" from its sub-regulatory policy. *See* SSR 16-3p, 2016 WL 1119029 (Oct. 25, 2017). The SSA explained that "subjective symptom evaluation is not an examination of an individual's character," but is instead an examination of the subjective complaints' consistency with other evidence in the record. SSR 16-3p, 2016 WL 1119029. Despite these changes in terminology, courts have concluded that SSR 16-3p did not substantially change existing law on this issue. *See Banks v. Comm'r of Soc. Sec.*, 2018 WL 6060449 at *5 (S.D. Ohio Nov. 20, 2018) (quoting language in SSR 16-3p that states intention to "clarify" and not to substantially "change" existing SSR 96-7p), adopted at 2019 WL 187914 (S.D. Ohio Jan. 14, 2019).

individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'" SSR 16-3p, 2016 WL 1119029 at * 9. Rather, an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.*; *see also Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so.").

An ALJ is not required to accept the claimant's complaints at face value but may discount them based on his consideration of the above factors. *See Dooley v. Comm'r of Soc. Sec.*, 656 Fed. App'x 113, 119 (6th Cir. 2016); *Bryson*, 2021 WL 2735993 at *15. In light of the ALJ's opportunity to observe the claimant's demeanor, the ALJ's evaluation of a claimant's subjective symptoms is entitled to considerable deference and should not be discarded lightly. *See Dooley*, 656 Fed. App'x at 119 ("[A]n ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.'") (*quoting Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007)); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *Jidas v. Comm'r of Soc. Sec.*, 2019 WL 2252289 at *8–9 (E.D. Mich. Feb. 26, 2019), *adopted by*, 2019 WL 1306172 (E.D. Mich. March 22, 2019). Indeed, a reviewing court should not disturb an ALJ's credibility determination "absent [a] compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001); *see also Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 788 (6th Cir. 2017) (noting that "while an ALJ's credibility determinations must be supported by substantial evidence, we accord them special deference"); *Hernandez v. Comm'r of Soc. Sec.*, 644 Fed. App'x 468, 476 (6th Cir. 2016) (noting that, "in practice ALJ credibility findings have become essentially 'unchallengeable.'"); *Riebe v. Comm'r*

*of Soc. Sec.*, 2019 WL 4600628 at * 7–8 (N.D. Ohio Sept. 23, 2019) (same).

The Commissioner defends the ALJ's "thoughtful consideration" of the evidence, arguing that the ALJ did not "discount [Mr. Padilla]'s allegations outright" but rather "weighed them with the other evidence and concluded that [Mr. Padilla] had some significant, albeit not disabling, mental limitations." (Def. Merits Br. at 12–13, PageID# 776–77.) The Commissioner further points out that no medical source opined on any greater limitations than those found by the state agency consultants. (*Id.* at 11, PageID# 775.) The Commissioner reads the medical records as "document[ing] overall improvement" with medication and counseling; the Commissioner specifically points out that the hygiene concerns documented in the records predating the alleged onset of disability are not identified in any records subsequent to the alleged onset date. (*Id.*)

After a careful consideration of the record, I agree with the Commissioner. The ALJ carefully considered Mr. Padilla's reported symptoms, the hearing testimony of Mr. and Ms. Padilla, and the years of medical records in evidence.

The standard for "substantial evidence" is "not high." *Biestek*, 139 S.Ct. at 1154. "The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). A reviewing court may not "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

"It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered" so long as the ALJ does not "selectivity include[] only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability." *Borawski v. Comm'r of Soc. Sec.*, No. 1:20-CV-01091-JDG, 2021 WL 811717, at *15 (N.D. Ohio Mar. 3, 2021); *see also Smith v. Comm'r of Soc. Sec.*, No. 3:18CV622, 2019 WL 764792, at *9 (N.D. Ohio Feb. 21, 2019) ("While the ALJ must consider all the evidence in the record, there is no requirement that the ALJ discuss all the evidence").

Here, the ALJ did not "cherry-pick" evidence to support a finding that Mr. Padilla was not disabled. To the contrary, the ALJ carefully and accurately summarized the medical records in evidence (Tr. 22–27) and correctly concluded that Mr. Padilla's (and Ms. Padilla's) reported symptomology was partially, but not fully, consistent with the record evidence. (Tr. 23.) The ALJ accurately noted that "[m]edical observations were somewhat limited due to being done via telephone and/or videoconferencing" and "were also limited due to the claimant's mother being the one speaking during his initial evaluation and some visits, rather than the providers having firsthand observations of the claimant." (Tr. 26.) Nevertheless, the ALJ acknowledged Mr. and Ms. Padilla's function report and testimony (Tr. 22–23) and factored in limitations related to autistic disorder despite noting (accurately) that a specialist declined to diagnose autism after a comprehensive evaluation *See* Tr. 24; *see also Pifer v. Comm'r of Soc. Sec.*, Case No. 1:21-CV-00314-CEH, 2022 WL 1521911, * (N.D. Ohio May 13, 2022) (affirming where the ALJ considered the claimant's subjective allegations and gave a thorough explanation as to why he found those allegations inconsistent with his activities and the medical evidence). While acknowledging that Mr. Padilla had been isolating and had certain limitations related to his mental

health conditions, the ALJ correctly noted that Mr. Padilla's symptoms improved with counseling and when adherent to medication. And the ALJ's RFC was consistent with the opinions of the state agency consultants at the initial and reconsideration level.

While it is true that the ALJ asked hypothetical questions to the vocational expert that were not ultimately adopted (such as remote work), an ALJ is not required to include limitations in an RFC that the ALJ finds are not applicable, even where the VE testifies that those limitations would be work preclusive. *See Rudd*, 531 F. App'x at 730 (holding that an ALJ is not "required to rely on a VE's response based on limitations that she rejected"); *Roberts v. Comm'r of Soc. Sec.*, No. 4:16 CV 2533, 2017 WL 5501323, at *13 (N.D. Ohio Oct. 19, 2017) ("an ALJ is not required to rely on a VE's response to limitations the ALJ ultimately does not adopt").

The ALJ's decision addresses Mr. Padilla's subjective complaints and explains why those complaints are not entirely consistent with the record. I am convinced that the ALJ considered all the relevant evidence and that a reasonable mind might accept the record evidence as adequate to support the ALJ's findings. I am convinced that there is no compelling reason for the Court to disturb the ALJ's findings. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732 (N.D. Ohio 2005). Accordingly, Mr. Padilla's assignment of error is without merit.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated: December 13, 2024

*/s Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII. NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same

argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).